Vernon S. Broderick, United States District Judge
Plaintiff Raymond Balestra, individually and on behalf of all others similarly situated, brings this putative class action against Defendants ATBCOIN LLC, Edward Ng, and Herbert W. Hoover, alleging that Defendants violated the Securities Act of 1933 (the "Securities Act" or the "Act"), 15 U.S.C. §§ 77a, et seq., by selling unregistered securities through an initial coin offering of the digital asset ATB Coin. Before me is Defendants' motion to dismiss Plaintiff's Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Because I find both that Plaintiff has established a prima facie case of personal jurisdiction over all Defendants, and that the Complaint plausibly alleges violations of §§ 12(a) and 15(a) of the Securities Act, Defendants' motion to dismiss is DENIED in its entirety. Plaintiff's unopposed motion for appointment as Lead Plaintiff and the appointment of Levi & Korsinsky, LLP as Lead Counsel is GRANTED.
I. Background [1]
Defendants Edward Ng and Herbert W. Hoover are co-founders and officers of Defendant ATBCOIN LLC ("ATB"), a technology start-up company aimed at facilitating rapid, low-cost digital financial transactions through revolutionary blockchain technology. (Compl. ¶¶ 3, 15-16.) From June 12, 2017 through September 15, 2017, ATB conducted an initial coin offering, or "ICO,"[2] through which ATB offered digital "ATB Coins" to the general public in exchange for other digital assets *347 (the "ATB ICO"). (Id. ¶ 2.) Defendants promoted the ATB Coin as "an innovative decentralized cryptocurrency incorporating the advanced technologies that tailor the needs of primary market players-users, investors, and business owners." (4/27/18 Kupka Decl. Ex. 1, at 2.)[3] The ATB Coin was "designed to overcome well-known inefficiencies within government central banks and other crypto currencies [and to] induce[ ] transactions that are fully secure, private and anonymous." (Id. )
The primary purpose of the ATB ICO was to raise capital to enable Defendants to create and launch a new blockchain (the "ATB Blockchain") on which the ATB Coins would operate. (Compl. ¶ 3.) According to Defendants, the ATB Blockchain would be "the fastest blockchain-based cryptographic network in the Milky Way galaxy," capable of delivering "blazing fast, secure and near-zero cost payments to anyone in the world." (Id. ) During the ICO, Defendants issued a range of promotional materials touting the ATB ICO as an investment opportunity. (Id. ¶ 33; see also id. ¶ 4 ("Only 3 days left before the launch of ATB Coin! Invest in the cryptocurrency of the future, while the project offers the most favorable terms!"); id. ¶ 28 ("Now every investor has the opportunity to become apart [sic] of the world technological evolution!"); id. ¶ 38 ("Grab the chance to invest in a very prospective project and change your life by filling it with new financial opportunities!").) Based on Defendants' statements in these materials, participants in the ICO expected the value of the ATB Coins they purchased to increase as more users adopted the ATB Blockchain. (Id. ¶ 42.)
When the ATB ICO launched in June 2017, Defendants offered one ATB Coin for $ 1, payable in the cryptocurrencies Bitcoin, Ether ("ETH"), or Litecoin. (Id. ¶ 5.) The terms of the offer varied throughout the ICO period, and by September 2017, the price of one ATB Coin had risen to $ 2.50, again payable in Bitcoin, ETH, or Litecoin. (Id. ¶¶ 5, 37.) All participants in the ICO also received a certain number of additional ATB Coins as a bonus. (Id. ¶ 37.) On August 21, 2017, Plaintiff Raymond Balestra ("Plaintiff" or "Balestra") participated in the ATB ICO, purchasing 388.5 ATB Coins in exchange for 2.100441 ETH. (Id. ¶ 13; id. Ex. 1.) In total, the ATB ICO raised over $ 20 million from thousands of investors. (Compl. ¶ 2.)
Defendants launched the ATB Blockchain on September 14, 2017 at the close of the ICO; however, the blockchain is not capable of the technological feats Defendants advertised. A review of the ATB ICO commented that it had "yielded nothing but a cheap reskinned [Bitcoin] wallet which is still in beta" and noted that the ATB Coin software failed to deliver many of the features Defendants had promised. (Id. ¶ 36 (commenting that there was "[n]o indication of development on a public blockchain testnet ... even though it was previously promised on [ATB's] roadmap").) As a result of the subpar performance of the ATB Blockchain, "adoption of ATB Coin and the ATB Blockchain has been essentially nonexistent, and the value of ATB Coins has continuously fallen." (Id. ¶¶ 3, 42.) As of March 11, 2018, the value of Plaintiff's ATB Coins had decreased by more than 85% from the price at which he purchased them. (Id. Ex. 1; Lead Pl. Br.
*348 5.)[4]
Defendants did not file a registration statement for the ATB ICO with the SEC at any point, either before, during, or after the ICO. (Compl. ¶¶ 1, 9, 55-57.)
II. Procedural History
Plaintiff filed his Complaint on December 21, 2017, (Doc. 1), alleging two claims against Defendants under the Securities Act: (1) a violation of § 12(a) for offering and selling unregistered securities in the form of ATB Coins, and (2) a violation of § 15(a) against Ng and Hoover as "control persons" of ATB. On January 9, 2018, counsel for Plaintiff published a notice over Business Wire , a nationally-circulated business-oriented wire service, announcing the initiation of this securities class action (the "Notice"). (3/12/18 Kupka Decl. Ex. 2.)[5] The Notice was targeted at and informed all persons who purchased ATB Coins pursuant to the ATB ICO that they would have until March 12, 2018 to file a motion to be appointed lead plaintiff. (Id. ) On March 12, 2018, the date specified in the Notice, Balestra filed his Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel, (Doc. 22), along with a supporting memorandum and declaration, (Docs. 23-24). No other member of the putative class has filed a motion seeking to be appointed lead plaintiff or opposing Balestra's motion. (See Doc. 26.)
On April 13, 2018, Defendants filed a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction over Defendants Ng and Hoover, and pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Doc. 27.) On that same date, Defendants also submitted a memorandum of law, (Doc. 31), and several supporting declarations, (Docs. 28-30). On April 27, 2018, Plaintiff filed his opposition to Defendants' motion to dismiss, (Doc. 33), along with a declaration in support, (Doc. 34). Defendants filed their reply, and an accompanying declaration, on May 4, 2018. (Docs. 37-38.)
III. Discussion
Defendants Ng and Hoover move to dismiss the Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), and all Defendants move to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Because I find both that Plaintiff has established a prima facie case of personal jurisdiction over Defendants Ng and Hoover, and that the Complaint plausibly alleges violations of §§ 12(a) and 15(a) of the Securities Act, Defendants' motion to dismiss the Complaint is denied. Plaintiff's unopposed motion for appointment as Lead Plaintiff and the appointment of Levi & Korsinsky, LLP as Lead Counsel is granted.
A. Rule 12(b)(2)
1. Applicable Law
When a defendant moves for dismissal for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant. Kernan v. Kurz-Hastings, Inc. , 175 F.3d 236, 240 (2d Cir. 1999). On a motion under Rule 12(b)(2), when the issue of personal jurisdiction "is decided initially on the pleadings *349 and without discovery, the plaintiff need show only a prima facie case." Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp. , 751 F.2d 117, 120 (2d Cir. 1984). Under this standard, a plaintiff "must plead facts which, if true, are sufficient in themselves to establish jurisdiction as to each defendant." S.E.C. v. Straub , 921 F.Supp.2d 244, 251 (S.D.N.Y. 2013) (internal quotation marks omitted). A plaintiff "can make this showing through his own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." Whitaker v. Am. Telecasting Inc. , 261 F.3d 196, 208 (2d Cir. 2001) (internal quotation marks omitted). Thus, a court may consider materials outside the pleadings when deciding a motion to dismiss for lack of personal jurisdiction. Hsin Ten Enter. USA, Inc. v. Clark Enters. , 138 F.Supp.2d 449, 452 (S.D.N.Y. 2000).
The exercise of specific jurisdiction[6] -which focuses on the "relationship among the defendant, the forum, and the litigation," Walden v. Fiore , 571 U.S. 277, 283-84, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014) -requires a two-step analysis, see, e.g., Licci ex rel. Licci v. Lebanese Canadian Bank, SAL , 732 F.3d 161, 170 (2d Cir. 2013). First, courts "evaluate the quality and nature of the defendant's contacts with the forum ... under a totality of the circumstances test." Id. (internal quotation marks omitted). To determine whether sufficient minimum contacts exist, "[t]he crucial question is whether the defendant has 'purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws, such that the defendant should reasonably anticipate being haled into court there.' " Best Van Lines, Inc. v. Walker , 490 F.3d 239, 242-43 (2d Cir. 2007) (quoting Burger King Corp. v. Rudzewicz , 471 U.S. 462, 474-75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ). It is "insufficient to rely on a defendant's 'random, fortuitous, or attenuated contacts' or on the 'unilateral activity' of a plaintiff" with the forum to establish specific jurisdiction. Walden , 571 U.S. at 286, 134 S.Ct. 1115 (quoting Burger King , 471 U.S. at 475, 105 S.Ct. 2174 ).
Second, if the defendant purposefully established minimum contacts with the forum, the court must be satisfied that exercising jurisdiction comports with due process and "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington , 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotation marks omitted); see also Straub , 921 F.Supp.2d at 252 ("If [minimum] contacts are found, the Court may assert personal jurisdiction so long as it is reasonable to do so under the circumstances of the particular case." (internal quotation marks omitted) ).
2. Application
Here, Plaintiff's claims arise under the Securities Act, which authorizes *350 nationwide service of process. See 15 U.S.C. § 77v(a) (permitting service "in any [judicial] district of which the defendant is an inhabitant or wherever the defendant may be found"). When a civil case arises under federal law and a federal statute authorizes nationwide service of process, courts often consider "contacts with the United States as a whole" as the "relevant contacts for determining personal jurisdiction." In re Platinum & Palladium Antitrust Litig. , No. 1:14-cv-9391-GHW, 2017 WL 1169626, at *40 (S.D.N.Y. Mar. 28, 2017) (internal quotation marks omitted); see also Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG , 277 F.Supp.3d 521, 589 (S.D.N.Y. Sept. 25, 2017) (observing that "several courts in this district addressing federal claims with national service of process ... have applied the 'national contacts' test," and collecting cases). "The rationale underlying this national contacts approach is that when the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation." In re LIBOR-Based Fin. Instruments Antitrust Litig. , No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Aug. 4, 2015, as amended Oct. 20, 2015) (internal quotation marks omitted). Although the Second Circuit has "not yet decided th[is] issue," it has observed that several other circuits have followed the national contacts approach. Gucci Am., Inc. v. Weixing Li , 768 F.3d 122, 142 n.21 (2d Cir. 2014). Thus, I assume for the purposes of this motion that the relevant contacts are those contacts of Ng and Hoover with the United States as a whole.
Specific jurisdiction requires that a defendant's contacts with the forum relate to the subject matter of the dispute. See, e.g., Straub , 921 F.Supp.2d at 251 ("[A] court may exercise 'specific jurisdiction' over a defendant where the suit 'arises out of or relates to the defendant's contacts with the forum.' " (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall , 466 U.S. 408, 414 n.8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) ) ). Defendants contend that "Plaintiff does not argue that Ng or Hoover had any contact with the forum related to the purported failure to register ATB Coin." (Reply Br. 10 (emphasis omitted).)[7] This is an overly narrow view of the subject matter of the litigation, and it ignores entirely contacts alleged in the Complaint.
Plaintiff has provided ample evidence that both Ng and Hoover targeted the U.S. market in an effort to promote the sale of ATB Coins, the very unregistered security at issue in this litigation. First, a June 8, 2017 ATB press release announced that both Ng and Hoover had attended a conference in New York "devoted to the launch of the advanced technological alternative base - ATB Coin." (See 4/27/18 Kupka Decl. Ex. 14.) A June 29, 2017 press release entitled "Ongoing ATB Coin ICO Raises over $ 14 million in 2 weeks from over 1000 Investors," (4/27/18 Kupka Decl. Ex. 8), contains an embedded video featuring both Hoover and Ng participating in what appears to be a second conference to promote the launch of the ATB ICO at the Marriott Marquis hotel in midtown Manhattan. (See 4/27/18 Kupka Decl. Ex. 8 (providing link to ATB Coin - Herbert W. Hoover & Edward Ng at the press conference, Marriott Marquis, New York (June 18, 2017), available at https://bitcoinprbuzz.com/press-release-atb-coin-ico (last visited Mar. 29, 2019) ).) That same press release includes a quote *351 from Ng boasting that the ATB Coin had "already attracted excited investors from the United States," among other countries. (Id. at 1.) In addition, Ng and Hoover are the sole members of Defendant ATBCOIN LLC, which conducted the ATB ICO and which lists a New York City address as its principal place of business in its incorporating documents. (See 4/27/18 Kupka Decl. 13, at 2-3.) Finally, a June 6, 2017 ATB press release in fact claims that "ATB Coin co-founder Herbert W. Hoover III is a member of America's iconic manufacturing family" who "resides in New York and travels worldwide." (4/27/18 Kupka Decl. Ex. 16.)[8]
In sum, Hoover's residence in New York (thereby making the United States his place of domicile), Hoover's and Ng's management of a business based in the United States, and their participation in conferences in the United States aimed at promoting the ATB Coin to United States investors clearly demonstrate that both Hoover and Ng "purposefully avail[ed themselves] of the privilege of conducting [business] activities within" the United States with respect to the ATB Coin and its corresponding ICO. Burger King , 471 U.S. at 475, 105 S.Ct. 2174 (internal quotation marks omitted). Given their substantial suit-related conduct in the United States, I further find that exercising jurisdiction over them would not offend due process. See Walden , 571 U.S. at 284, 134 S.Ct. 1115 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.").
B. Rule 12(b)(6)
1. Applicable Law
To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This standard demands "more than a sheer possibility that a defendant has acted unlawfully." Id. "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." L-7 Designs, Inc. v. Old Navy, LLC , 647 F.3d 419, 430 (2d Cir. 2011).
In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's *352 favor. Kassner , 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Iqbal , 556 U.S. at 678, 129 S.Ct. 1937 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." Id.
Finally, a complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc. , 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted). A document is "incorporated by reference" where the complaint contains a "clear, definite and substantial reference" to that document. Helprin v. Harcourt , 277 F.Supp.2d 327, 330-31 (S.D.N.Y. 2003).
2. Application
Plaintiff alleges two claims under the Securities Act: first, that all Defendants violated Section 12(a), 15 U.S.C. § 77l(a), by offering and selling unregistered securities in the form of ATB Coins; and second, that Ng and Hoover are also liable as "control persons" of ATB, pursuant to Section 15(a), id. § 77o(a). Defendants contend that both counts fail to state a claim.
a. ATB Coins Qualify as "Securities"
Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77l(a)(1), provides a private right of action against any person who "offers or sells a security" in violation of § 5 of the Act, which in turn prohibits the offer or sale of unregistered securities, id. § 77e. Accordingly, as a necessary prerequisite to a § 12(a) violation, the item that is offered or sold must constitute a "security" within the meaning of the Act. Under § 2(a)(1), the definition of a "security" includes an "investment contract." See 15 U.S.C. § 77b(a)(1). "[T]he 'touchstone' of an investment contract [is] 'the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others....' " S.E.C. v. Edwards , 540 U.S. 389, 395, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004) (quoting United Hous. Found., Inc. v. Forman , 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) ).
The determination of whether a particular offering qualifies as an investment contract-and, in turn, a security-is governed by the three-prong test set forth in S.E.C. v. W.J. Howey Co. ("Howey "), 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Under Howey , an offering is an investment contract security where there is "(i) an investment of money; (ii) in a common enterprise; (iii) with the expectation of profits to be derived solely from the efforts of others." Gugick v. Melville Capital, LLC , No. 11-CV-6294 (CS), 2014 WL 349526, at *4 (S.D.N.Y. Jan. 31, 2014) (citing Howey , 328 U.S. at 298-99, 66 S.Ct. 1100 ). The Howey test is a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Howey , 328 U.S. at 299, 66 S.Ct. 1100. In analyzing whether an investment satisfies the Howey test, "form should be disregarded for substance." Tcherepnin v. Knight , 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Moreover, the emphasis should be on the "economic realities underlying a transaction, and not on the name appended thereto." United Hous. Found. , 421 U.S. at 849, 95 S.Ct. 2051 ; see also United States v. Zaslavskiy , No. 17 CR 647 (RJD), 2018 WL 4346339, at *4 (E.D.N.Y. Sept. 11, 2018) ("Whether a transaction or instrument *353 qualifies as an investment contract is a highly fact-specific inquiry.").
Both parties agree that Howey governs the determination of whether ATB Coin constitutes a "security," (see Defs.' Br. 7-8; Pl.'s Opp. 5),[9] and Defendants do not dispute that the first prong of the test-i.e., an investment of money-is satisfied here, where Plaintiff exchanged 2.1 ETH for 388.5 ATB Coins, (see Compl. Ex. 1). Defendants contend, however, that the Complaint fails to plead facts satisfying the second and third prongs of the Howey test-that is, that Plaintiff invested in a "common enterprise" with "profits to be derived solely from the efforts of others."
1. Common Enterprise
A plaintiff may demonstrate a common enterprise by pleading the existence of "horizontal commonality."[10] Revak v. SEC Realty Corp. , 18 F.3d 81, 87 (2d Cir. 1994). In an enterprise marked by horizontal commonality, "the fortunes of each investor in a pool of investors" are tied to one another and to the "success of the overall venture." Id. (internal quotation marks omitted). "In fact, a finding of horizontal commonality requires a sharing or pooling of funds." In re J.P. Jeanneret Assocs., Inc. , 769 F.Supp.2d 340, 359 (S.D.N.Y. 2011) (quoting Revak , 18 F.3d at 87 ); see also Kaplan v. Shapiro , 655 F.Supp. 336, 339-40 (S.D.N.Y. 1987) ("Courts espousing a theory of horizontal commonality require plaintiff[s] to show a pooling of the investors' interests in order to establish a common enterprise.").
Plaintiff alleges that the fortunes of all ATB Coin purchasers were tied to one another because "the ATB ICO investments were pooled under the control of Defendant ATB." (Compl. ¶ 42.) Defendants respond that Plaintiff has merely "parrot[ed] the standard that Plaintiff is required to satisfy." (Reply Br. 3.) However, the Complaint also alleges that the primary goal of the ATB ICO "was to raise capital to create and launch a new blockchain that would 'deliver blazing fast, secure and near-zero cost payments to anyone in the world.' " (Compl. ¶ 3 (quoting 4/27/18 Kupka Decl. Ex. 1, at 2).) Thus, the funds raised through the ICO were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the value of Plaintiff's ATB Coins. Cf. Zaslavskiy , 2018 WL 4346339, at *6 (finding horizontal commonality in case involving two "virtual currency investment schemes" where it could "readily be inferred from the facts alleged that [defendant's] investment strategies depended upon the pooling of investor assets to purchase real estate and diamonds").[11]
*354 Although Defendants insist that purchasers of the ATB Coin "gained no share in a common enterprise, but rather exercised individual control over the ATB Coin asset," (Defs.' Br. 9), Plaintiff plausibly alleges that the "potential profits stemming from the future valuation of the ATB Coins [ ] w[ere] entirely reliant" on the success of Defendants' new blockchain. (Compl. ¶ 42.; see also Rensel v. Centra Tech, Inc. , No. 17-24500-CIV, 2018 WL 4410126, at *5 (S.D. Fla. June 25, 2018) (finding a common enterprise where "the fortunes of individual investors in [Defendants'] ICO were directly tied to the failure or success of the products the Defendants purported to develop"), report and recommendation adopted , 2018 WL 4828444 (S.D. Fla. Sept. 25, 2018).) Indeed, that is-at least in part-the way Defendants marketed ATB Coins. (See Compl. ¶¶ 3, 38, 39.) Essentially, Defendants encouraged investors to purchase ATB Coins based on the claim that the speed and efficiency of the ATB Blockchain would result in an increase in the coins' value.
Defendants correctly note that ATB Coins did not entitle purchasers to a pro rata share of the profits derived from any ATB-managed transaction. (See Defs.' Br. 9; see also Revak , 18 F.3d at 87 (noting that "horizontal commonality ... usually [involves] the pro-rata distribution of profits").) However, such a formalized profit-sharing mechanism is not required for a finding of horizontal commonality. In a recent administrative proceeding, the SEC determined that a similar ICO run by Munchee Inc.-the company behind an iPhone application that allowed users to post reviews of restaurant meals-constituted a securities offering, even though the terms of the offer did not provide for a pro rata distribution of profits. See In the Matter of Munchee Inc. ("Munchee "), Securities Act Release No. 10445, 2017 WL 10605969 (Dec. 11, 2017).[12] In October 2017, Munchee launched an initial coin offering through which it offered digital "MUN tokens" to the general public in order to raise capital to further develop the Munchee App, thereby "ensur[ing] the smooth operation of the MUN token ecosystem." Id. at *2-3. The SEC concluded that the MUN token was a security, even though it "did not promise investors any dividend or other periodic payment." Id. at *7. Rather, investors were led to believe that as more individuals began using the MUN "ecosystem," the value of investors' MUN tokens would increase. Id. Like the MUN token, the value of ATB Coins was dictated by the success of the ATB enterprise as a whole, thereby establishing horizontal commonality. See Revak , 18 F.3d at 87 (horizontal commonality exists where the fortunes of each investor are tied "to the success of the overall venture").
2. Profits Derived Solely from the Efforts of Others
The third prong of the Howey test is satisfied where investors have been *355 "led to expect profits solely from the efforts of the promoter." United States v. Leonard , 529 F.3d 83, 88 (2d Cir. 2008) (quoting Howey , 328 U.S. at 299, 66 S.Ct. 1100 ). The Second Circuit has established that "the word 'solely' should not be construed as a literal limitation; rather [courts] consider whether under all the circumstances, the scheme was being promoted primarily as an investment." Id. (internal quotation marks omitted); see also Rensel , 2018 WL 4410126, at *5 ("[T]he third prong of the Howey test is satisfied when the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."). I find that Plaintiff's allegations establish that purchasers of ATB Coins reasonably believed that those coins would increase in value based primarily on Defendants' entrepreneurial and managerial efforts.
First, Defendants launched a marketing campaign for ATB Coins that highlighted the potential profits that would result simply from holding those coins. In a July 9, 2017 press release, ATB stated: "ATB investors are serious people from many prosperous countries, they are interested in the development of the company, the growth of the rate, and of course, the profit, which as is known, will soon come to those who are 100% sure of the possibilities of cryptocurrency." (Compl. ¶ 38 (quoting 4/27/18 Kupka Decl. Ex. 7, at 1).) That same press release described the ATB ICO as "the realization of a crowdfunding model, where participants finance the development of the company now in order to get revenue from it in the future." (4/27/18 Kupka Decl. Ex. 7, at 1.) Similarly, the Frequently Asked Questions section of ATB's website states: "the first users of ATB Coin cryptocurrency can be compared to investors in a start-up, which can later acquire value, due to its usefulness and popularity. Thus, the acquisition of the first ATB Coin becomes a kind of investment with a long-term perspective." (Compl. ¶ 39 (quoting 4/27/18 Kupka Decl. Ex. 11).) All of these advertisements "promoted" ATB Coins "as an investment" that would generate profits for investors without any effort on their part. Leonard , 529 F.3d at 88 ; see also Zaslavskiy , 2018 WL 4346339, at *6 (finding third prong of Howey test satisfied where ICO token at issue "was described to investors as 'an attractive investment opportunity' which 'grows in value,' and as having 'some of the highest potential returns' " (internal citations omitted) ).[13] Although Defendants are correct that "[t]he mere presence of a speculative motive on the part of purchaser or seller does not evidence the existence of an investment contract," (Defs.' Br. 15 (quoting Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc. , 253 F.Supp. 359, 367 (S.D.N.Y. 1966) ), here Defendants conveyed to purchasers of ATB Coins that the anticipated return on their investment would be the result of Defendants' efforts to commercialize the ATB Blockchain and ATB Coins.
Furthermore, the Complaint satisfactorily pleads that the success of ATB Coins was entirely dependent on Defendants' following *356 through on their promise to launch and improve the ATB Blockchain. As the Complaint alleges, "the value of ATB Coins was expected to rise from the speed of transactions on the ATB Blockchain that was promoted as 'the fastest blockchain-based cryptographic network in the Milky Way galaxy.' " (Compl. ¶ 42 (quoting 4/27/18 Kupka Decl. Ex. 2, at 1).) When the ATB Blockchain failed to deliver the groundbreaking technology that Defendants touted, users did not adopt it and the value of the ATB Coins plummeted. (See id. ¶¶ 36, 42 ("Given that the ATB Blockchain is not capable of such feats and has generally not been adopted or successful, ATB Coins have minimal value.").)
Although Defendants argue that ATB Coin purchasers "had complete control over [their ATB] coins as soon as they were purchased, including the decisions of when and for how much to sell," (Reply Br. 7),[14] purchasers had no control over whether the new ATB Blockchain technology worked. See Zaslavskiy , 2018 WL 4346339, at *7 ("Though [defendant] suggested that [ ] investors could trade [digital] coins on an external exchange and make more profit, there is no indication that investors were to have any control over the management of [defendant's business]."); see also Munchee , 2017 WL 10605969, at *7 (finding that "[i]nvestors had little choice but to rely on Munchee and its expertise" to generate profits because, "[a]t the time of the offering and sale of MUN tokens, no other person could make changes to the Munchee App or was working to create an 'ecosystem' to create demand for MUN tokens"). The failure of that technology was likely to-and, in fact, did-render ATB Coins undesirable, regardless of the individual purchaser's "business skills." (Compl. ¶ 35.)
Defendants invoke Noa v. Key Futures, Inc. , 638 F.2d 77, 80 (9th Cir. 1980), for the proposition that their statements of intent to create the ATB Blockchain did not render the purchase of the ATB Coins that were to be traded on that blockchain an investment contract because purchasers assumed the risk that the ATB Blockchain would never be launched. (See Defs.' Br. 14.) Noa , however, is easily distinguishable. There, plaintiff's had purchased silver from defendants but defendants subsequently became insolvent and failed to deliver the silver. 638 F.2d at 79-80. Plaintiff's then argued that an investment contract had been created because the success of their investment depended on the efforts of defendants to deliver the *357 silver. Id. The Ninth Circuit rejected this contention and noted that the risk plaintiff's assumed that defendants might become insolvent within the thirty-day period during which they were required to deliver the silver was the same risk "which any buyer takes when he pays in advance for goods to be delivered in the future." Id. at 80. The court added that "[t]here [wa]s a national market for silver which [wa]s not dependent upon [defendants]." Id. The opposite is true here: without the promised ATB Blockchain, there was essentially no "market" for ATB Coins, which clearly distinguishes the coins from the precious metals to which Defendants attempt to analogize them. (See Defs.' Br. 13-14.)
Given the content of Defendants' marketing materials and their sole responsibility for developing and launching the ATB Blockchain-the performance of which largely dictated the value of ATB Coins-I conclude that the Complaint satisfactorily pleads that purchasers of the ATB Coin were "led to expect profits solely from the efforts" of Defendants. See Leonard , 529 F.3d at 88 (quoting Howey , 328 U.S. at 299, 66 S.Ct. 1100 ). Accordingly, I find that Plaintiff's Complaint plausibly alleges facts demonstrating that the ATB Coin qualifies as an "investment contract" under the Howey test. Defendants' motion to dismiss the Complaint on the ground that the ATB Coin is not a security within the meaning of § 2(a)(1) of the Securities Act is therefore denied.[15]
b. Primary Liability Under Section 12(a)
An individual may be held liable under § 12(a) if he "successfully solicits the purchase of securities, so long as he is motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Pinter v. Dahl , 486 U.S. 622, 643, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). "Liability does not require that the defendant actually passed title of the security"; rather, "[a]ny person who 'engaged in steps necessary to the distribution' of the unregistered security is liable."
*358 S.E.C. v. Tecumseh Holdings Corp. , No. 03 Civ. 5490 (SAS), 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009) (quoting S.E.C. v. Chinese Consol. Benevolent Ass'n , 120 F.2d 738, 741 (2d Cir. 1941) ). Defendants contend that the Complaint fails to allege any facts suggesting that Ng and Hoover are primarily liable under § 12(a). To the contrary, the Complaint contains numerous allegations indicating that both Ng and Hoover "engaged in steps necessary to the distribution of" ATB Coins, and therefore fall within the ambit of § 12(a).
In addition to alleging that Ng and Hoover are co-founders of ATB, (Compl. ¶¶ 15-16), the Complaint contains several references to the personal involvement of Ng and Hoover in publicizing the ATB ICO. The Complaint quotes extensively from a June 29, 2017 press release-which is incorporated into the Complaint by reference, (see Compl. ¶¶ 2, 46 (quoting 4/27/18 Kupka Decl. Ex. 8) )-identifying Ng as the CEO of ATB and describing Ng's comments that (1) ATB's "technologically revolutionary cryptocurrency has already attracted excited investors from the United States, Canada, and China"; (2) Ng was "pleased with the current high level of interest and optimism from investors"; and (3) Ng expected ATB's ICO to "meet the estimated target amount of $ 50 million," (4/27/18 Kupka Decl. Ex. 8, at 1). In addition, as discussed in the personal jurisdiction analysis, see supra Part III.A.2, the press release contains an embedded video of both Hoover and Ng participating in a New York City conference promoting the "launch" of the ATB ICO. (See Compl. ¶ 46 n.25 (providing link to ATB Coin - Herbert W. Hoover & Edward Ng at the press conference, Marriott Marquis, New York (June 18, 2017), available at https://bitcoinprbuzz.com/press-release-atb-coin-ico (last visited Mar. 29, 2019) ).) The video reflects both Hoover's and Ng's efforts to pitch ATB Coin to attendees and features a speech by Ng touting the "new technology" behind the ATB Coin. (Id. at 0:35-0:54.)
The Complaint also references a June 2017 promotional interview with Defendant Hoover. (See Compl. ¶ 36 (providing link to Interview with Herbert W. Hoover, ATB Coin (June 7, 2017), available at https://www.youtube.com/watch?v=oXU3PljUl5E (last visited Mar. 29, 2019) ).) In that interview, Hoover explains how ATB Coin operates and praises it as a "global currency that will be safe, innovative, and easy to use [and which] can replace all existing payment methods and currencies and become the universal financial instrument." (Id. at 2:09-2:35.) At the close of the interview, Hoover comments, "I see our financial future and I don't want you to miss the chance to become part of it. The ATB Coin project is presented by a crowdfunding and everyone can invest in it...." (Id. at 4:35-4:55.)
These promotional statements trumpeting the potential of the ATB Coin and the ongoing opportunity to invest in the ATB ICO-all of which are quoted verbatim in the Complaint or incorporated therein by reference-clearly reflect both Ng's and Hoover's efforts to solicit the sale of ATB Coins. See Pinter , 486 U.S. at 643, 108 S.Ct. 2063. And, because Ng and Hoover are the sole members and officers of ATB, (see 4/27/18 Kupka Decl. Ex. 13, at 3, 7), they stood to directly benefit from those sales, see Pinter , 486 U.S. at 643, 108 S.Ct. 2063 (requiring that the solicitation be motivated, at least in part, by defendants' "own financial interests"). I therefore conclude that the allegations set forth in the Complaint plausibly allege that both Ng and Hoover "engaged in steps necessary to the distribution of the unregistered security," Tecumseh Holdings Corp. , 2009 WL 4975263, at *3 (internal quotation marks omitted), thereby subjecting them to primary liability for any violation of § 12(a).
*359 c. Control Person Liability
In the alternative, Plaintiff alleges that pursuant to § 15(a) of the Securities Act, Ng and Hoover are "control persons" of ATB, and are thus jointly and severally liable for any violation of the Act by ATB. See 15 U.S.C. § 77o(a) (providing that an individual who "controls any person liable under [§ 12 of the Act] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable"). "In order to state a claim for control person liability under section 15 of the Securities Act, a plaintiff must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." In re Scottish Re Grp. Sec. Litig. , 524 F.Supp.2d 370, 387 (S.D.N.Y. 2007) (internal quotation marks omitted).
Plaintiff's § 12(a) claim alleging that Defendant ATB engaged in the sale of unregistered securities satisfies the first element-i.e., a "primary violation" of the Act. As to the second element-i.e., whether Ng and Hoover exercised "control" over ATB-the Second Circuit defines "control" as "the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise." In re Lehman Bros. Mortg.-Backed Sec. Litig. , 650 F.3d 167, 185 (2d Cir. 2011) (internal quotation marks omitted) (applying the standard for control person claims under § 20(a) of the Securities Exchange Act of 1934 to claims under § 15 of the Securities Act).
ATB's Limited Liability Company Agreement (the "LLC Agreement"), which Plaintiff references in the Complaint, (see Compl. ¶¶ 15-16), reveals that Ng and Hoover are not only the sole members of ATB but also the company's sole officers. (See 4/27/18 Kupka Decl. Ex. 13, at 7 (identifying Ng as President and Treasurer, and Hoover as Secretary).) The LLC Agreement specifies that the President "shall be the chief executive officer of the Company [and] shall have general and active management of the business of the Company." (Id. ) In addition, the "Voting Members" of ATB-i.e., Ng and Hoover-"shall collectively ... have all of the powers of the Company and may exercise all of the rights and powers of a member under the [Delaware Limited Liability Company] Act." (Id. at 3, 8.) These rights include, but are "not limited to" the power to manage or dispose of ATB's property, enter into contracts on the company's behalf, lend money on behalf of the company, and perform the company's obligations under any agreement to which it is bound. (Id. at 8-9.) Defendants protest that "[o]fficer or director status alone does not constitute control," (Defs.' Br. 18 (quoting Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc. , 104 F.Supp.3d 441, 576 (S.D.N.Y. 2015) ) ), but the terms of the LLC Agreement make clear that Ng and Hoover-the only individuals mentioned by name in the agreement-are the lifeblood of ATB and are responsible for the "active management" of the company's operations. (4/27/18 Kupka Decl. Ex. 13, at 7.)
Moreover, as discussed above, see supra Part III.B.2.b, both Ng and Hoover were integral to the launch of the ATB ICO. In conjunction with their positions as the sole Officers and Voting Members of ATB, Ng's and Hoover's leading roles in promoting the company's lone business product are sufficient at the motion-to-dismiss stage to establish that Ng and Hoover possessed the power to direct "the management and policies" of ATB, and are therefore control persons of ATB under § 15(a). See In re Lehman Bros. , 650 F.3d at 185.
*360 C. Motion to Appoint Lead Plaintiff and Lead Counsel
Next, I turn to the unopposed motion of Plaintiff Raymond Balestra, pursuant to the Private Securities Litigation Reform Act of 1995, as amended (the "PSLRA"), 15 U.S.C. § 77z-1(a)(3), for an order (1) appointing Balestra as lead plaintiff on behalf of all persons who invested or participated in the ATB ICO that began on June 12, 2017 and concluded on September 15, 2017, both dates inclusive (the "Class Period"); and (2) approving the selection of Levi & Korsinsky, LLP as lead counsel for the putative class. Because Balestra's motion is unopposed, and he meets all requirements set out by the PSLRA, Balestra's motion to be appointed as Lead Plaintiff and for approval of Levi & Korsinsky as Lead Counsel is granted.
1. Appointment of Lead Plaintiff
The procedures set forth in the PSLRA, 15 U.S.C. §§ 77 -78, govern the appointment of lead plaintiff's in securities class actions. The PSLRA was enacted with the goal of "prevent[ing] lawyer-driven litigation" and "ensur[ing] that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs' counsel." Weltz v. Lee , 199 F.R.D. 129, 131 (S.D.N.Y. 2001) (internal quotation marks omitted); see also In re Oxford Health Plans, Inc., Sec. Litig. , 182 F.R.D. 42, 43-44 (S.D.N.Y. 1998) ; H.R. Conf. Rep. No. 104-369. Before its enactment, "professional plaintiff's" overwhelmingly and disproportionately profited, "irrespective of the culpability of the defendants" and "at the expense of shareholders with larger stakes." Schulman v. Lumenis, Ltd. , No. 02 Civ.1989(DAB), 2003 WL 21415287, at *2 (S.D.N.Y. June 18, 2003) (citing In re Party City Sec. Litig. , 189 F.R.D. 91, 103 (D.N.J. 1999) ).
Consistent with this intent, under the PSLRA, courts are directed to appoint as lead plaintiff "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 77z-1(a)(3)(B)(i). There is a rebuttable presumption that the adequate plaintiff is the person or group of persons who (1) filed the original complaint or filed a motion in response to the notice; (2) in the determination of the court, has the largest financial interest in the relief sought by the class; and (3) otherwise meets the requirements of Rule 23 of the Federal Rules of Civil Procedure. See id. § 77z-1(a)(3)(B)(iii)(I). Other class members may rebut this presumption by providing evidence that the presumptively adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." Id. § 77z-1(a)(3)(B)(iii)(II).
Here, because Balestra filed a timely motion, has represented that-to his knowledge-he has the largest financial interest in this litigation, and otherwise meets the requirements of Rule 23 of the Federal Rules of Civil Procedure, as further detailed below, I appoint him as Lead Plaintiff.
a. Timeliness
As an initial matter, the PSLRA requires that the named plaintiff in the first-filed action publish a notice of the pendency of the action in a "widely circulated national business-oriented publication or wire service" within twenty days from the date that the complaint is filed. 15 U.S.C. § 77z-1(a)(3)(A)(i). The notice must inform the purported plaintiff class of the pendency of the action, the claims *361 asserted in the complaint, the purported class period, and the ability to move, within sixty days of the notice, to serve as lead plaintiff of the purported class. Id. Courts strictly adhere to this sixty-day rule, and any motion filed after the sixty-day period will not be considered except under rare circumstances. See Khunt v. Alibaba Grp. Holding Ltd. , 102 F.Supp.3d 523, 534 (S.D.N.Y. 2015) (calling the sixty-day deadline a "strict deadline"); Reitan v. China Mobile Games & Entm't Grp., Ltd. , 68 F.Supp.3d 390, 397 (S.D.N.Y. 2014) ("Courts within and outside of this District typically adhere strictly to the requirement that movants file their lead plaintiff motions within sixty days of the date when notice is published.").
Plaintiff's counsel published the Notice on January 9, 2018, (3/12/18 Kupka Decl. Ex. 2), nineteen days after Plaintiff filed his Complaint in this Court on December 21, 2017, (Doc. 1), thereby satisfying the twenty-day requirement set forth in 15 U.S.C. § 77z-1(a)(3)(A)(i). Further, Plaintiff filed his motion for appointment as lead plaintiff on Monday, March 12, 2018, (Doc. 22), satisfying the requirement that such motion be filed within sixty days of publication of the notice of pendency of the action, 15 U.S.C. § 77z-1(a)(3)(A)(i)(II). Therefore, Plaintiff timely filed his motion under the PSLRA.
b. Largest Financial Interest
The PSLRA does not specify a method by which to determine which plaintiff has the "largest financial interest." In re Fuwei Films Sec. Litig. , 247 F.R.D. 432, 436 (S.D.N.Y. 2008). In fact, neither the Supreme Court nor the Second Circuit has explicitly provided a test. See id. Thus, courts in this district typically apply the four-factor test first adopted in Lax v. First Merchants Acceptance Corp. , No. 97 C 2715, 1997 WL 461036 (N.D. Ill. Aug. 11, 1997), when making a determination as to which party has the largest financial interest. Those factors include: (1) number of shares purchased during the class period; (2) number of net shares purchased during the class period; (3) net funds expended during the class period; and (4) approximate financial losses suffered. See In re Fuwei Films , 247 F.R.D. at 436 (setting forth elements of the Lax test); Aude v. Kobe Steel, Ltd. , No. 17-CV-10085 (VSB), 2018 WL 1634872, at *3 (S.D.N.Y. Apr. 4, 2018) (applying Lax test where motion for lead plaintiff was unopposed).
Balestra is the only member of the putative class to have filed a complaint or moved to be appointed lead plaintiff. During the Class Period, Balestra (1) purchased 388.5 ATB Coins; (2) still holds all of the ATB Coins he purchased; (3) expended 2.100441 ETH on the purchase of those coins; and (4) as of March 11, 2018, had incurred losses of approximately $ 1,422.99 in connection with his purchase of ATB Coins during the Class Period. (3/12/18 Kupka Decl. Ex. 1; Lead Pl. Br. 5.) As such, he has the largest financial interest of any class member seeking appointment as lead plaintiff, and he is aware of no other class member with a larger financial interest. (Lead Pl. Br. 4; see also Varghese v. China Shenghuo Pharm. Holdings, Inc. , 589 F.Supp.2d 388, 394 (S.D.N.Y. 2008) (evaluating who "of those seeking to serve as lead plaintiff" had the "largest financial interest in the relief sought by the class" (internal quotation marks omitted) ); Aude , 2018 WL 1634872, at *3 (concluding that movant, who was the sole member of the purported class to request appointment as lead plaintiff, had the "largest financial interest of any class member seeking appointment as lead plaintiff").) Even if a class member were to materialize who had a larger financial interest than Balestra, any such class member *362 did not adhere to the time limits set forth in the Notice and I would likely reject any application by that individual, absent extraordinary circumstances.
c. Rule 23
The final requirement of 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I) is that the movant must also satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure. Rule 23 states:
One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.
Fed. R. Civ. P. 23(a). The Rule 23 analysis in the context of the appointment of lead plaintiff "need not be as complete as would a similar determination for the purpose of class certification." In re eSpeed, Inc. Sec. Litig. , 232 F.R.D. 95, 102 (S.D.N.Y. 2005) (citing In re Crayfish Co. Sec. Litig. , No. 00 Civ. 6766(DAB), 2002 WL 1268013, at *4 (S.D.N.Y. June 6, 2002) ). An individual moving for appointment as lead plaintiff is only required to make a prima facie showing that he satisfies Rule 23's requirements, and courts need only consider the typicality and adequacy requirements. See In re Crayfish Co. , 2002 WL 1268013, at *4.
With respect to typicality, courts consider whether the claims of the proposed lead plaintiff "arise from the same conduct from which the other class members' claims and injuries arise." In re Initial Pub. Offering Sec. Litig. , 214 F.R.D. 117, 121 (S.D.N.Y. 2002) (quoting In re Crayfish Co. , 2002 WL 1268013, at *5 ); see also Oxford Health Plans , 182 F.R.D. at 50. While the claims need not be identical, the claims of the proposed lead plaintiff must be substantially similar to the other members' claims. See Canson v. WebMD Health Corp. , No. 11 Civ. 5382(JFK), 2011 WL 5331712, at *4 (S.D.N.Y. Nov. 7, 2011).
The adequacy requirement is satisfied where the proposed lead plaintiff "adequately protect[s] the interests of the class." Fed. R. Civ. P. 23(a)(4). The presumptive lead plaintiff meets this requirement when he (1) has no conflict of interest with the other members of the class; (2) has selected counsel that is qualified, experienced, and generally able to conduct the litigation in question; and (3) has sufficient interest in the outcome of the case. See Reitan , 68 F.Supp.3d at 400.
Balestra meets both the typicality and adequacy requirements of Rule 23. Balestra alleges that he, "like the other members of the Class, purchased ATB Coins from Defendants during the ATB ICO that were unregistered securities in violation of the federal securities laws." (Lead Pl. Br. 7.) I am satisfied that Balestra's claims and legal arguments are similar to those of other purchasers of ATB Coins who were allegedly injured, and are thus representative of the putative class. Accordingly, I find that Balestra has made a sufficient showing of typicality at this stage of the proceedings.
Balestra has also demonstrated that he meets the adequacy requirement at this stage of the litigation. Balestra has retained well-qualified and experienced counsel, his degree of losses suggests he will have a sufficient interest in advocating on behalf of the putative class members, and there is no reason to believe that his *363 claims would be subject to any unique defenses.
Because I find that Balestra satisfies the requirements of 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I) and no party has rebutted his status as the most adequate plaintiff, Balestra is appointed Lead Plaintiff in the instant action.
2. Appointment of Lead Counsel
The PSLRA provides that the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 77z-1(a)(3)(B)(v). There is a "strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection." Sallustro v. CannaVest Corp. , 93 F.Supp.3d 265, 278 (S.D.N.Y. 2015) (internal quotation marks omitted).
Here, Balestra has selected Levi & Korsinsky, LLP as class counsel, and moves for approval of that selection. (Lead Pl. Br. 8.) Having reviewed Balestra's memorandum of law, as well as the March 12, 2018 Kupka Declaration and the firm resume attached as Exhibit 3 to the Kupka Declaration, I find that the attorneys at Levi & Korsinsky have substantial experience in successfully prosecuting complex securities class actions and that Levi & Korsinsky is well qualified to serve as lead counsel in the instant case. (See Lead Pl. Br. 8; 3/12/18 Kupka Decl. Ex. 3, at 1-7.) Therefore, I appoint Levi & Korsinsky as Lead Counsel.
IV. Conclusion
For the foregoing reasons, Defendants' motion to dismiss, (Doc. 27), is DENIED. Balestra's motion for appointment as Lead Plaintiff and for approval of his selection of Lead Counsel, (Doc. 22), is GRANTED.
The Clerk of Court is respectfully requested to terminate the open motions at Documents 22 and 27.
SO ORDERED.

The following factual summary is drawn from the allegations of the Class Action Complaint for Violation of Sections 12(a)(1) and 15(a) of The Securities Act of 1933 ("Complaint" or "Compl."), filed on December 21, 2017, (Doc. 1), and exhibits attached or incorporated by reference thereto, unless otherwise indicated. I assume the allegations in the Complaint to be true for purposes of this motion. See Kassner v. 2nd Ave. Delicatessen Inc. , 496 F.3d 229, 237 (2d Cir. 2007). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

The U.S. Securities and Exchange Commission ("SEC") has defined an "initial coin offering" or "ICO" as
[A] recently developed form of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration (most commonly Bitcoin, Ether, or fiat currency). The [coins] are issued and distributed on a "blockchain" or cryptographically-secured ledger. [Coins] often are also listed and traded on online platforms, typically called virtual currency exchanges, and they usually trade for other digital assets or fiat currencies. Often, [coins] are listed and tradeable immediately after they are issued.
In the Matter of Munchee Inc. , Securities Act Release No. 10445, 2017 WL 10605969, at *2 n.1 (Dec. 11, 2017).

"4/27/18 Kupka Decl." refers to the Declaration of Christopher J. Kupka in Support of Plaintiff's Response in Opposition to Defendants' Motion to Dismiss Plaintiff's Class Action Complaint, filed April 27, 2018, (Doc. 34).

"Lead Pl. Br." refers to the Memorandum of Law in Support of Plaintiff's Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel, filed March 12, 2018, (Doc. 23).

"3/12/18 Kupka Decl." refers to the Declaration of Christopher J. Kupka in Support of Plaintiff's Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel, filed March 12, 2018, (Doc. 24).

Plaintiff has alleged that Defendant Hoover resides in the United States, see infra , which would likely render him subject to general jurisdiction. See In re Roman Catholic Diocese of Albany, N.Y., Inc. , 745 F.3d 30, 38 (2d Cir. 2014) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile...." (internal quotation marks omitted) ). However, Plaintiff's arguments in support of personal jurisdiction are confined to specific jurisdiction, (see Pl.'s Opp. 23-25), and I therefore limit my analysis to specific jurisdiction as well. ("Pl.'s Opp." refers to the Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Class Action Complaint, filed April 27, 2018, (Doc. 33).) Moreover, because I find that Defendant Hoover is subject to specific jurisdiction, I need not address whether he is also subject to general jurisdiction in this forum.

"Reply Br." refers to the Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), filed May 4, 2018, (Doc. 37).

Hoover disputes this contention and submits that he "ha[s] not resided in the United States since 1998," (Hoover Decl. ¶ 3). ("Hoover Decl." refers to the Declaration of Herbert W. Hoover, dated April 12, 2018, (Doc. 29).) I note that the document Plaintiff cites as support is a press release issued by Defendants themselves-not a document created by some third party. In any event, however, "where, as here, the defendant has challenged the plaintiff['s] factual allegations of jurisdiction, 'the court may provisionally accept disputed factual allegations as true.' " In re Alstom SA Sec. Litig. , 406 F.Supp.2d 346, 397-98 (S.D.N.Y. 2005) (quoting Credit Lyonnais Sec. (USA), Inc. v. Alcantara , 183 F.3d 151, 153 (2d Cir. 1999) ). "In making such a ruling, the court need only determine whether the facts alleged by the plaintiff, if true, are sufficient to establish jurisdiction...." Id. Thus, for the purposes of this motion, I credit the documentation provided by Plaintiff indicating that Hoover resides in New York.

"Defs.' Br." refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), filed April 13, 2018, (Doc. 31).

Alternatively, a plaintiff may also demonstrate a common enterprise by pleading "strict vertical commonality," see Gugick , 2014 WL 349526, at *4 (citing Revak v. SEC Realty Corp. , 18 F.3d 81, 87-88 (2d Cir. 1994) ), which "requires that the fortunes of plaintiff and defendants are linked so that they rise and fall together," id. (internal quotation marks omitted). Because I find that Plaintiff has sufficiently pleaded horizontal commonality and therefore satisfies the second prong of the Howey test, I do not address whether strict vertical commonality is also present here.

In Zaslavskiy , the defendant had been charged with securities fraud for allegedly making "materially false and fraudulent representations and omissions in connection with two purported virtual currency investment schemes and their related [ICOs]." 2018 WL 4346339, at *1. The United States District Court for the Eastern District of New York denied defendant's motion to dismiss the indictment, in which defendant had argued that the challenged ICOs "did not involve securities and [we]re beyond the reach of the federal securities laws." Id. The court concluded that the indictment was "constitutionally sufficient and m[et] the pleading requirements set forth in the Federal Rules of Criminal Procedure." Id.

Although SEC administrative orders entered into in contemplation of settlement are not binding precedent, see, e.g., In re Synovis Life Techs., Inc. Sec. Litig. , No. Civ. 04-3008ADMAJB, 2005 WL 2063870, at *8 (D. Minn. Aug. 25, 2005), the parties address Munchee in detail in their respective briefs, (see Defs.' Br. 10-11, 13 n.5; Pl.'s Opp. 8-10), and I also find Munchee instructive, given the parallels between the Munchee and ATB ICOs and the lack of precedent relating to the proper characterization of digital coins offered by initial coin offering under the federal securities laws.

The SEC determined that similar advertising in Munchee led purchasers of the MUN token to "reasonably believe they could profit by holding or trading MUN tokens, whether or not they ever used the Munchee App." 2017 WL 10605969, at *4 ; see also id. (quoting a Munchee blog post that touted, "[a]s more users get on the platform, the more valuable your MUN tokens will become"); id. at *8 ("Investors' expectations were primed by Munchee's marketing, [which] likened MUN to prior ICOs and digital assets that had created profits for investors and [Munchee] specifically marketed to people interested in those assets-and those profits....").

Purchasers' ability to resell ATB Coins on other exchanges also supports the conclusion that the coins are securities. (See 4/27/18 Kupka Decl. Ex. 12 ("ATB Coin plans to expand its presence on large and prospective crypto-exchange platforms, offering its investors more opportunities to multiply their investments....").) The Chairman of the SEC has identified the ability to trade on a secondary market as a "key hallmark[ ] of a security." See Statement on Cryptocurrencies and Initial Coin Offerings, Jay Clayton, Chairman, U.S. Sec. & Exch. Comm'n (Dec. 11, 2017) ("It is especially troubling when the promoters of [ICOs] emphasize the secondary market trading potential of these tokens. Prospective purchasers are being sold on the potential for tokens to increase in value-with the ability to lock in those increases by reselling the tokens on a secondary market-or to otherwise profit from the tokens based on the efforts of others."), available at https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (last visited Mar. 29, 2019); see also Report of Investigation Pursuant to Section 21(a) of the Sec. Exch. Act of 1934: The Dao, Exchange Act Release No. 81207, 2017 WL 7184670, at *7 (July 25, 2017) (concluding that digital DAO Tokens issued through an ICO were securities, in part because "[t]he DAO Website and other promotional materials ... represent[ed] that DAO Tokens would be available for secondary market trading after the Offering Period via several platforms").

Defendants separately contend that ATB Coin qualifies as a "currency" under the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), and is therefore "exempted" from the definition of a "security" under the federal securities laws. (Defs.' Br. 15-17.) To support their contention, Defendants cite several decisions that analyze whether Bitcoin-a distinct digital asset-falls within the definitions of various crimes under the federal criminal code. See United States v. Murgio , 209 F.Supp.3d 698, 706-10 (S.D.N.Y. 2016) (determining that Bitcoins constitute "funds" under 18 U.S.C. § 1960, which prohibits "unlicensed money transmitting business[es]"-i.e., businesses that "transfer[ ] funds on behalf of the public"); United States v. Faiella , 39 F.Supp.3d 544, 545 (S.D.N.Y. 2014) (same); United States v. Ulbricht , 31 F.Supp.3d 540, 569-70 (S.D.N.Y. 2014) (concluding that the money laundering statute, 18 U.S.C. § 1956, which prohibits "financial transactions" involving property known to represent the proceeds of a crime, "is broad enough to encompass use of Bitcoins"). None of these decisions addresses the proper characterization of Bitcoin under the federal securities laws.
As discussed above, whether a digital asset qualifies as an "investment contract"-and hence, a "security"-under the Securities Act is determined by the Howey test. See Zaslavskiy , 2018 WL 4346339, at *7 ("[Defendant] overlooks the fact that simply labeling an investment opportunity as 'virtual currency' or 'cryptocurrency' does not transform an investment contract-a security-into a currency."). Moreover, although the parties have not briefed the issue, there appear to be important distinctions between Bitcoin and ATB Coin, including, among other things, the fact that Bitcoins were not issued through an ICO. See Bitcoin Investment Trust, 2017 Annual Report 87 (Apr. 2, 2018), available at https://backend.otcmarkets.com/otcapi/company/financial-report/190125/content (last visited Mar. 29, 2019).